**ELLIOTT GREENLEAF, P.C.**
By: John M. Elliott / Timothy T. Myers / Colin J. O'Boyle
Attorney I.D. 04414 / 46959 / 206742
Union Meeting Corporate Center V
925 Harvest Drive
P. O. Box 3010
Blue Bell, PA   19422
(215) 977-1000          **Attorneys for Plaintiff**

*Filed and Attested by the*
*Office of Judicial Records*
*29 MAR 2016 02:43 pm*
*K. EDWARDS*

| | | |
|---|---|---|
| Marla Green | : | **IN THE COURT OF COMMON PLEAS** |
| 1320 Monk Road | : | **OF PHILADELPHIA, PENNSYLVANIA** |
| Gladwyne, PA | : | |
| Plaintiff, | : | |
| v. | : | |
| James DiDio | : | |
| 800 Mill Creek Road | : | **March Term, 2016** |
| Gladwyne 19035 | : | |
| | : | **C.A. No. _____** |
| Nicholas J. DiDio | : | |
| 19276 N. Hibiscus Street | : | |
| Weston, FL 33332 | : | |
| | : | |
| Christopher DiDio | : | **JURY TRIAL DEMANDED** |
| 329 Hale Drive | : | |
| Southampton, PA 18966 | : | |
| | : | |
| Jacob DiDio | : | |
| 4633 McClelland Drive | : | |
| Wilmington, NC 28405 | : | |
| | : | |
| Dynasty Motors, LLC | : | |
| 2610 N. 23rd Street | : | |
| Wilmington, North Carolina 28401, | : | |
| Defendants | : | |

| NOTICE TO DEFEND | AVISO |
|---|---|
| You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with this court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the | Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificación.  Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si |

case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.   You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

**IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

**PHILADELPHIA BAR ASSOCIATION LAWYER REFERENCE SERVICE**

**ONE READING CENTER PHILADELPHIA, PA  19107 (215) 238-1701**

usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación.   Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.   Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

**LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO. VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.**
**ASOCIACIÓN DE LICENCIADOS DE FILADELFIA**

**SERVICIO DE REFERENCIA E INFORMACIÓN LEGAL**

**ONE READING CENTER FILADELFIA, PA  19107 TELEFONO: (215) 238-1701**

Case ID: 160302832

**ELLIOTT GREENLEAF, P.C.**
By: John M. Elliott / Timothy T. Myers / Colin J. O'Boyle
Attorney I.D. 04414 / 46959 / 206742
Union Meeting Corporate Center V
925 Harvest Drive
P. O. Box 3010
Blue Bell, PA   19422
(215) 977-1000          **Attorneys for Plaintiff**

| | |
|---|---|
| **Marla Green**<br>1320 Monk Road<br>Gladwyne, PA<br><br>      **Plaintiff,**<br><br>  **v.**<br>**James DiDio**<br>800 Mill Creek Road<br>Gladwyne 19035<br><br>**Nicholas J. DiDio**<br>19276 N. Hibiscus Street<br>Weston, FL 33332<br><br>**Christopher DiDio**<br>329 Hale Drive<br>Southampton, PA 18966<br><br>**Jacob DiDio**<br>4633 McClelland Drive<br>Wilmington, NC 28405<br><br>**Dynasty Motors, LLC**<br>2610 N. 23rd Street<br>Wilmington, North Carolina 28401,<br>      **Defendants** | **IN THE COURT OF COMMON PLEAS<br>OF PHILADELPHIA, PENNSYLVANIA**<br><br><br><br>**March Term, 2016**<br><br>**C.A. No.** _____<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

  Plaintiff Marla Green hereby files this Complaint against Defendants James DiDio, Christopher DiDio, Jacob DiDio, Nicholas J. DiDio, Dynasty Motors, LLC (collectively, "Defendants") and John Does 1-10 and Jane Does 1-10, for fraud, conspiracy, conversion, and equitable and injunctive relief.  Plaintiff also files this Complaint against Defendant James DiDio

Case ID: 160302832

for breach of fiduciary duty.[1]

In support thereof, Plaintiff alleges as follows:

## PARTIES

1.      Plaintiff is an adult individual residing at 1320 Monk Rd, Gladwyne, Pennsylvania.

2.      Defendant James DiDio ("Defendant DiDio") is an adult individual residing at 800 Mill Creek Road, Gladwyne, Pennsylvania 19035.

3.      Defendant Nicholas J. DiDio is an adult individual residing at 19276 N Hibiscus St., Weston, FL 33332. He can also be served at Defendant Dynasty Motors, 2610 N. 23rd Street, Wilmington, North Carolina 28401. Defendant Nicholas DiDio performed accounting and/or financial services on behalf of Dynasty Motors and his other co-defendants and co-conspirators to harm Plaintiff Marla Green, and on information and belief is an owner of Defendant Dynasty Motors, LLC. Defendant Nicholas DiDio is the adult son of Defendant James DiDio, and repeatedly travelled to Pennsylvania to conspire with and conduct the illegal misconduct set forth below.

4.      Defendant Christopher DiDio is an adult individual who resides at 329 Hale Drive, Southampton, PA 18966. He can also be served at Defendant Dynasty Motors, 2610 N. 23rd Street, Wilmington, North Carolina 28401. Defendant Christopher DiDio is an owner and the Chief Operating Officer of Defendant Dynasty Motors, LLC. Defendant Christopher DiDio is the adult son of Defendant James DiDio. To the extent that Defendant Christopher DiDio did

---

[1] On March 10, 2016, Plaintiff initially commenced this civil action against Defendants and two other individuals, Michael DiDio and Luke DiDio in this Court docket at March Term, 2016, Civil Action No. 00662. Plaintiff later learned that Michael DiDio and Luke DiDio each filed for Chapter 7 Bankruptcy just days before that action was filed. See Michael DiDio Bankruptcy at Case No. 16-14197-ABA (N.J. Bank.) and Luke DiDio Bankruptcy at Case No. 16-01078-5-SWH (E.D. N.C. Bankr.) Though co-conspirators, neither Michael DiDio nor Luke DiDio is a party to this new action.

Case ID: 160302832

not at all relevant times reside in Pennsylvania, he repeatedly travelled to Pennsylvania to conspire with and conduct the illegal misconduct set forth below.

5.    Defendant Jacob ("Jake") DiDio is an adult individual residing at 4633 McClelland Drive, Wilmington, NC 28405 and/or at 223 Peiffer Street, Wilmington, NC 28405. He can also be served at Defendant Dynasty Motors, 2610 N. 23rd Street, Wilmington, North Carolina 28401. Defendant Jacob DiDio is an employee of Defendant Dynasty Motors, LLC, and on information and belief has an ownership interest in it.  Defendant Jacob DiDio is the adult son of Defendant James DiDio, and he repeatedly travelled to and from Pennsylvania to conspire with and conduct the illegal misconduct set forth below.

6.    Defendant Dynasty Motors, LLC ("Defendant Dynasty Motors") is a limited liability company with its principal place of business at 2610 N. 23rd Street, Wilmington, North Carolina 28401.  By and through its officers and principals, Co-Conspirators Michael DiDio and Luke DiDio in concert with the other Defendants, Defendant Dynasty Motors repeatedly travelled to Pennsylvania to conspire with and conduct the illegal misconduct set forth below.

7.    Defendant Dynasty Motors, LLC can be served c/o its Co-CEO, Michael DiDio, at 247 Lawnside Ave., Haddon Township, NJ 08108, New Jersey and or its Co-CEO, Luke DiDio, at 502 Foxfield Ct., Wilmington, NC 28411-7160.

8.    At all relevant times, Defendant Dynasty Motors, LLC was owned and controlled by Co-Conspirators Michael DiDio and Luke DiDio.

9.    Defendants John Does 1-10 and Jane Does 1-10 are individuals and businesses located in Pennsylvania, New Jersey, North Carolina, Florida, Washington, D.C., Maryland, and Delaware, and other parts yet unknown, who conspired with and aided and abetted Defendant James DiDio's fraudulent schemes to steal from and systematically drain financial accounts and

Case ID: 160302832

assets of Plaintiff Green and of the beneficiaries of trusts and trust accounts.

10.    As more fully set forth below, all of the Defendants conspired to and illegally committed fraudulent acts to divert and convert Plaintiff's money, assets and property for their own personal use.

11.    Plaintiff reserves the right to amend this Complaint to assert additional facts and claims against Defendants and others during and after discovery.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this matter pursuant to, *inter alia*, 42 Pa.C.S. § 5301.

13.    Venue is proper in this County pursuant to Pennsylvania Rule of Civil Procedure 1006 because, *inter alia*, fraudulent misconduct, transactions, occurrences, conspiracies and breaches set forth herein occurred in Philadelphia, Pennsylvania.

## FACTS

14.    Defendant DiDio has over thirty years of experience in retail and commercial banking, and additional experience in trusts and wealth management.

15.    Marla Green and Defendant DiDio married on December 19, 2008.

16.    At that time, Defendant DiDio had no assets other than a single IRA Account of less than $240,000, and had already been unemployed for several years.    Despite his misappropriation, diversion and conversion of millions of Plaintiff's dollars, assets, stock, property and other things of value, Defendant DiDio's IRA account remained substantially untouched and intact.

17.    For the duration of the marriage he continued to be unemployed, except for limited occasions when he gained personal income from failed business ventures he orchestrated

4

Case ID: 160302832

by using Plaintiff's money, property and assets, including Radnor Trust Company, Majestic Jet / PushFly, LLC ("PushFly"), ECAP IV and Peak Performance V, LLC ("Peak Performance").

18.    In fact, these failed business ventures were schemes to divert Plaintiff's capital and assets into funds which he then diverted to himself and his Co-Defendants and co-conspirators.

19.    Plaintiff Green had assets of approximately twenty million dollars ($20,000,000), including, but not limited to, cash, real and personal property, and trust funds for her and her children, with virtually no debt.

20.    Unbeknownst to Plaintiff Green, Defendant DiDio repeatedly committed fraud, bank fraud, mortgage fraud, mail and wire fraud, money-laundering, conversion and theft of millions of dollars of her funds, including trust funds, and of other assets and real and personal property, and conspired with and was aided and abetted by Michael Santosusso and others in Philadelphia who will be identified in discovery and may be added as defendants.

21.    Also unbeknownst to Plaintiff Green, Defendant DiDio repeatedly committed fraud, mail and wire fraud, money-laundering, conversion and theft of Plaintiff Green's funds, including trust funds, and of other assets and property, including her furniture and other personal property, and conspired with the other Defendants, to fraudulently steal, convert and divert Plaintiff's property and assets to fund, finance and operate Defendant Dynasty Motors and its facility at 2610 N. 23rd Street, Wilmington, North Carolina, and conspired with and was aided and abetted by Co-Conspirators Michael DiDio and Luke DiDio, and Defendants Nicholas J. DiDio, Christopher DiDio, Jacob DiDio, Dynasty Motors and others in Philadelphia, Pennsylvania, New Jersey, Florida, Delaware and North Carolina to do so.

22.    Plaintiff Green was not aware and could not learn of the illegal misconduct of

Case ID: 160302832

Defendant DiDio and his co-conspirators and Defendants because they actively concealed it from her.

23.     Defendant DiDio and Santosusso were aware of the material misrepresentations and omissions made by each other and by Defendant DiDio to Plaintiff and federally-insured banks, and they conspired with each other to fraudulently induce banks and Plaintiff to enter into mortgages on the Margate property, Monk Road property, Mirabeau property and the loans for Peak Performance as set forth below.

24.     Defendant DiDio and the other Defendants were all aware of the material misrepresentations and omissions made by each other and by Defendant DiDio to Plaintiff, and they conspired with and aided and abetted each other to fraudulently steal, convert and divert Plaintiff's property, assets and funds to fund, open and operate Dynasty Motor and its facility at 2610 N. 23rd Street, Wilmington, North Carolina.

### Summary Description Of The Fraudulent Financial Schemes

25.     Defendant DiDio used his banking and financial experience to steal millions of dollars from Plaintiff.

26.     Plaintiff trusted and relied completely on Defendant DiDio to manage her financial affairs.

27.     In furtherance of Defendants' schemes to divert and convert Plaintiff's money, assets and property, Defendant DiDio entered into different business ventures with known and unknown associates and conspirators, Radnor Trust Company; ECAP IV and Peak Performance, and its two fitness gyms in Washington, D.C.; PushFly; and Majestic Jet with convicted felons Richard ("Rick") Ianieri and Timothy ("TJ") Beverley; and Defendant Dynasty Motors, LLC with his Co-Defendant sons, as more fully set forth below.

Case ID: 160302832

28.     Defendant DiDio controlled Plaintiff's financial matters, including preparing all financial statements.

29.     Defendant DiDio instructed Plaintiff to sign certain financial documents, which she did because of her trust in him.

30.     Defendant DiDio also repeatedly forged Plaintiff's name and initials to certain financial documents, including to checks and wire transfer instructions.

31.     Defendant DiDio caused banks and financial institutions to address mail solely to him, even when the accounts were jointly in the name of Plaintiff, and otherwise lured her into not opening mail from banks or other financial institutions, as he fraudulently moved her money through dozens of accounts at several banks and institutions to divert it into accounts solely in his name as his own personal piggy bank.

32.     He created passwords and security procedures to ensure that she could not learn how, and when, he was moving her money and assets from her name to himself.

33.     Between 2009 and 2014, he opened, closed and secretly moved Plaintiff's money through dozens of accounts at several banks, financial institutions and credit accounts, thereby fraudulently diverting, converting and stealing millions of dollars belonging to Plaintiff.

34.     One of the primary financial institutions used by Defendant DiDio's to defraud Plaintiff was Parke Bank at 1610 Spruce Street, Philadelphia PA 19103.

35.     Parke Bank was a small bank that was not even incorporated until 2005, and operated out of shared space in a brick front townhouse at 16th and Spruce streets in Philadelphia.

36.     Before January 2009, Plaintiff Green had no relationship with Park Bank.

37.     In 2009, DiDio set up eight (8) different accounts at Parke Bank and deposited over $12,300,000 into those accounts in Philadelphia between 2009 and 2014, that he then

Case ID: 160302832

systematically drained, including $3,000,000 in payments to American Express, from which he further diverted funds to himself.

38.    In January 2009, Defendant DiDio fraudulently set up an account at Parke Bank with a $1,500,000 deposit from Plaintiff's funds at Nextier Bank in the name of James DiDio, and in the names of Plaintiff's children, which did not have the benefit of FDIC protection or security of a larger more established bank.

39.    Defendant DiDio then transferred $100,000 of the $1,500,000 to an account solely in his name at Parke Bank, and transferred $1,429,736, including interest earned, to a joint account of James DiDio and Marla Green.    After accruing additional interest, DiDio then transferred $1,456,765 to his own account at Parke Bank.

40.    Defendant DiDio also abused his special and fiduciary relationships, including as financial advisor to Plaintiff, to gain access to all of Plaintiff's accounts, confidential information, passwords, originals and copies of her signature, and power of attorney, to steal millions of dollars from Plaintiff, including cash, funds, stock, securities, personal property and other tangible things of value.

41.    Defendant DiDio deployed several fraudulent schemes to steal millions of dollars from Plaintiff, including forging her signatures to financial applications and instructions for wire transfers, and other documents to steal her funds and assets.

42.    Additionally, Defendant DiDio repeatedly forged Plaintiff's signatures to checks, and wrote checks to himself or to cash for hundreds of thousands of dollars.

43.    He also placed mortgages onto her previously unencumbered real estate, sucked millions of dollars of equity out of them, and laundered this money through dozens of bank, financial, business and credit card accounts to himself

8

Case ID: 160302832

44.    One of Defendant DiDio's co-conspirators was Michael Santosusso, a mortgage broker at Vantage Point Bank.  On February 28, 2014, the Pennsylvania Department of Banking and Securities closed Vantage Point Bank, and the FDIC was appointed Receiver.  Vantage Point's primary market area was the Philadelphia region.

45.    Prior to Vantage Point's FDIA Receivership, Defendant DiDio and Santosusso conspired to fraudulently inflate Defendant DiDio's financial statements and misrepresent his employment status and monthly compensation to submit to banks for mortgages and loans, including to Hudson Bank, Parke Bank, Bancorp, WSFS and M&T.

46.    Although Vantage Point had a loan processing office in Cherry Hill, NJ, Santosusso lived in and routinely worked from Philadelphia to originate and sell residential mortgage loans to third-party investors for a fee.

47.    Santosusso conspired with and aided and abetted Defendant DiDio in Philadelphia, where they committed many of the fraudulent acts set forth herein.

48.    Defendant DiDio and Santosusso concealed their misconduct, actions, misrepresentations and omissions from Plaintiff.

49.    Defendant DiDio repeatedly delivered fraudulently altered financial records to Santosusso in Philadelphia over the telephone and electronic wires, and also over interstate lines to Santosusso in New Jersey.

50.    Santosusso and DiDio fabricated financial statements in Philadelphia for Defendant DiDio that continued to inflate Plaintiff's assets, employment status and monthly compensation for submission to financial institutions to obtain millions of dollars in mortgage financing.

51.    As more fully set forth herein, Defendant DiDio and Santosusso repeatedly

Case ID: 160302832

submitted false and fraudulent financial statements to banks to obtain millions of dollars in mortgages, encumbering Plaintiff's properties in Margate, New Jersey and on Monk Road and Mirabeau Lane.

52.    Prior to Defendant DiDio's fraudulent misconduct, the Margate and Monk Road properties had no debt, but thereafter had first, second, and third mortgages with personal guarantees from Plaintiff.

53.    As more fully set forth herein, Defendant DiDio and Santosusso submitted false and fraudulent financial statements to Hudson Bank, Bancorp, WSFS and M&T banks including but not limited to the following misrepresentations concerning net worth:

- an October 18, 2011 financial statement Defendant DiDio fraudulently submitted to Hudson Bank for a $750,000 loan on the Margate property that misrepresented $13.6 million net worth;

- a March 22, 2012 financial statement Defendant DiDio fraudulently submitted to WSFS for a $750,000 loan that misrepresented net worth to be $27.2 million;

- a March 26, 2012 financial statement Defendant DiDio fraudulently submitted four (4) days later to Hudson Bank for a $1.5 million loan showing net worth to be $12.1 million;

- a November 12, 2012 financial statement Defendant DiDio fraudulently submitted to Hudson Bank for a $1.0 million loan showing an increase in net worth by 50% to $18.1 million in just over six (6) months;

- a January 23, 2013 financial statement Defendant DiDio fraudulently submitted to Hudson Bank for a $1.9 million loan showing net worth to be $22.5 million, now fraudulently almost doubling the net worth in less than a year;

10

Case ID: 160302832

- a February 6, 2013 financial statement Defendant DiDio fraudulently submitted to Bancorp for a $1.1 million loan showing net worth to be $13 million, thereby abruptly dropping purported net worth by almost half in just two (2) weeks;

- a November 27, 2013 financial statement Defendant DiDio fraudulently submitted to WSFS/M&T for a loan of $650,000 showing net worth for Plaintiff and Defendant DiDio to be $36 million, thereby fraudulently tripling net worth in nine (9) months; and

- all of these fraudulently submitted financial statements further contained false and material misrepresentations concerning, *inter alia*, DiDio's employment and monthly income because at all relevant times he was unemployed.

### The Margate Property

54.     On November 5, 2008, Plaintiff purchased two lots in Margate, a house and an adjacent lot, for $2,950,000 in cash, with no mortgage.

55.     Defendant DiDio conspired with and was aided and abetted by Santosusso to fraudulently obtain mortgages on Plaintiff's Margate property to divert cash from Plaintiff's equity in the Margate property solely to Defendant DiDio.

56.     Between March and November 2011, Defendant DiDio, and his co-conspirator Santosusso fraudulently obtained a mortgage on Plaintiff's Margate property.

57.     On or before October 18, 2011, Defendant DiDio told Plaintiff Green that they could not receive financing on property Plaintiff owned in her name only unless Defendant DiDio made a joint application because of his years of banking experience, and history of employment, and his purportedly more favorable credit report, so that would have to be added to the title on the home.

11

Case ID: 160302832

58.    On October 18, 2011, Defendant DiDio and Santosusso fraudulently submitted to Hudson Bank a financial statement for a mortgage on the Margate property that falsely misrepresented $13.6 million net worth, and $62,500 in monthly compensation from employment at Radnor Trust, even though he was fired from it in 2009 and it had ceased operations more than six (6) months earlier in March 2011.

59.    In fact, Defendant DiDio was unemployed, and his sole source of compensation for the entirety of times relevant herein was through businesses funded by Plaintiff.

60.    Despite Defendant DiDio having no assets other than an IRA of $240,000, DiDio's mortgage application for the Margate represented joint assets of over $14 million and a net worth of $13.6 million.

61.    Prior to settlement on the loan on December 16, 2011, title was transferred from Plaintiff to Defendant DiDio and Plaintiff.

62.    On December 16, 2011, Hudson Bank funded a $750,000 mortgage on the property based on the misrepresented financial information in the mortgage application.  Net proceeds of $723,800 were deposited into a Parke Bank account.

63.    Defendant DiDio then secretly moved the $723,000 into and through various accounts, until he ultimately diverted it to himself.

64.    In January 2013, the Margate Property's adjacent lot was sold for $800,000, paying off the 2011 Hudson Bank $750,000 mortgage.  The lot with the home was unencumbered once again, although the $750,000 from the 2011 Hudson Bank mortgage had already been stolen by Defendant DiDio, and the real property was now only one lot, instead of the original two lots.

65.    After the sale of the adjacent lot, Defendant DiDio submitted another mortgage

Case ID: 160302832

application for the unencumbered remaining portion of the Margate property with a fraudulent November 11, 2012 financial statement that showed an increase in net worth by 50% to $18.1 million in just over six (6) months, and now fraudulently reported employment and monthly compensation of $120,000 from Radnor Trust, even though he was fired from it in 2009 and it had been shut down in March 2011. In fact, Defendant DiDio was unemployed.

66.    On February 28, 2013, Hudson Bank funded a mortgage loan for $1,000,000 based on Defendant DiDio's fraudulent financial information and employment misrepresentations, and deposited net proceeds of $938,000 into Parke Bank.

67.    Defendant DiDio then secretly moved this $938,000 into, and through, various accounts until it ultimately diverted it to himself.

68.    The current balance on the mortgage on the Margate Property is approximately $950,000.

69.    Thus, Defendant DiDio fraudulently diverted approximately $1.75 million dollars from Plaintiff Green's Margate Property into his own personal piggy bank.

**The Monk Road Property**

70.    On July 29, 2005 Plaintiff purchased a property on Monk Road in Gladwyne for $4,350,000.

71.    Plaintiff paid approximately $1,000,000 for down payment and closing costs, and obtained a mortgage from Nextier Bank for approximately $3,450,000.

72.    Plaintiff paid off the loan to Nextier on December 22, 2008, and the property remained unencumbered through May 2012, except for a minimal line of credit/home equity loan balance of less than $150,000 with Republic Bank.

73.    Between May 2012 and September 2013, Defendant DiDio conspired with and

Case ID: 160302832

was aided and abetted by Santosusso to fraudulently obtain another mortgage on Plaintiff's Monk Road property to divert cash from the equity in the property solely to DiDio.

74.    On March 26, 2012, Defendant DiDio fraudulent submitted a financial statement on his mortgage application for Monk Road listing assets of $12.2 million, maintaining his prior misrepresentation that he was employed by Radnor Trust Bank at a combined compensation of $62,000 per month, even though he was fired from it in 2009 and it had been shut down a year earlier.

75.    On May 23, 2012, Defendant DiDio again fraudulently induced Plaintiff Green to transfer title to both their names by misrepresenting it was necessary to get the financing because of his years of banking experience, history of employment, and his purportedly more favorable credit report, even though Defendant DiDio had no assets of his own and no employment.

76.    On June 12, 2012, based on Defendant DiDio's misrepresentations, Hudson Bank funded a mortgage for $1,500,000.

77.    Defendant DiDio deposited the net proceeds of $1,347,000 from this Hudson Bank loan into Parke Bank.

78.    Defendant DiDio then secretly moved this $1,347,000 into and through various Parke Bank and other accounts until he ultimately diverted it to himself.

79.    The current balance on the Hudson Bank loan is approximately $1,400,000.

80.    As more fully set forth below, in September 2013, Defendant DiDio fraudulently obtained a second mortgage for $1,100,000 with Bancorp in connection with funding the purchase of Mirabeau Lane.

81.    Defendant DiDio thus diverted and converted approximately $2.5 million dollars in equity from the Monk Road Property for his own personal piggy bank.

Case ID: 160302832

### The Mirabeau Lane Property

82.    Defendant DiDio insisted on moving to a larger and more expensive home on Mirabeau Lane in Gladwyne.

83.    Defendant DiDio conspired with and was aided and abetted by Santosusso to present a fraudulent loan application to Hudson Bank, continuing to misrepresent that DiDio was employed by Radnor Trust with collective compensation of over $60,000 a month even though he was fired from it in 2009 and it had shut down in 2011.    Additionally, Defendant DiDio misrepresented that the net worth had increased by $4.3 million, essentially by adding $1,750,000 in furniture and $2.4 million in "collectables" to the financial statement.

84.    However Hudson Bank capped the loan at $1,900,000 or 50% loan to value, because it had already loaned $1,500,000 on Monk Road, and likely also because Defendant DiDio's fraudulently inflated financial statement indicated there were sufficient funds to pay a higher equity amount.

85.    Defendant DiDio had to find another source of money for closing on the Mirabeau property because, as more fully set forth below, he had drained Plaintiff Green's resources by ordering and buying a new custom plane and committing over $2.6 million of Plaintiff Green's funds for a new company he formed, Peak Performance and ECAP IV, to purchase two fitness gyms in Washington, DC, a business he abused to siphon off additional funds belonging to Plaintiff.

86.    Unable to get enough funding for the Mirabeau property from Hudson Bank, DiDio approached Bancorp for a loan to be secured by a second mortgage on the Mirabeau home.

87.    Between November 2012 and May 2013, Defendant DiDio conspired with and

Case ID: 160302832

was aided and abetted by Santosusso to fraudulently obtain another mortgage from Bancorp.

88.    In and around November, 2012 through February 2013, Defendant DiDio, in concert with and aided and abetted by Santosusso, repeatedly committed mortgage fraud, bank fraud and wire fraud to secure financing for the property and to steal cash from Plaintiff's equity.

89.    For example, DiDio used "wite-out"™ correction fluid and scissors to fraudulently alter bank account statements submitted to Hudson Bank, and then faxed them over the telephone wires and by electronic means to Bancorp, Michael Santosusso, at Vantage Point Bank in Philadelphia and Cherry Hill, and to WSFS in Delaware, to secure a mortgage on the Mirabeau Lane house.

90.    Between November, 2012 through February 2013, DiDio repeatedly "wited-out" and/or cut out the following references on bank account statements and submitted them to Bancorp, Parke Bank, Hudson Bank, Vantage Point Bank and/or others by fax over the telephone wires and/or by electronic means:

- All government mandated references **"FOR THE ACCOUNT OF WSFS BANK COLLATERAL ACCT FBO"** for Plaintiff Green on Invest Financial Corp at WSFS January, February, March, August, October, November and December 2012 statements for account ending #1912, thereby falsely inflating qualifying assets of almost a million dollars;

- All government mandated references **"Co-Trustee with [name redacted] and [name redacted] under Deed of Trust of [name redacted] dated [date redacted] for the Benefit of"** Plaintiff Green at BNY Mellon Wealth Management March 2012 statements for account ending #6000, thereby falsely inflating qualifying assets by millions of dollars;

Case ID: 160302832

- All government mandated references on the Parke Bank statement ending December 31, 2012 for account ending in #704 **that it was actually Defendant DiDio's IRA account** and could not be used as collateral pursuant to federal and state regulations, thereby falsely inflating qualifying assets by $241,367;

- On January 14, 2013, DiDio faxed Accounts Summary of Parke Bank accounts to Michael Santosusso with the same government mandated references identifying non-qualifying information "wited-out" and cut out thereby falsely inflating qualifying assets by millions of dollars; and

- On February 5, 2013, DiDio faxed 2011 account statements from BNY Mellon Wealth Management, Uvest Financial Services to Megan Chila at WSFS with the same government mandated references identifying non-qualifying information "wited-out" and cut out thereby falsely inflating qualifying assets by millions of dollars.

91.    The fraudulent financial statements submitted by Defendant DiDio also included the full amount of the accounts he had "wited-out" as current liquid assets, when in fact they could not be considered assets at all for even Plaintiff, and could never be included on any mortgage application as consideration for or security by any lending bank.

92.    Santosusso knew or should have known that Defendant DiDio had fraudulently deleted portions of the account statements because Defendant DiDio separately told Santosusso on November 8, 2012 that the Parke Bank account ending in #704 was an IRA account, but nevertheless "wited" out all references to it being an IRA account and then faxed and/or emailed the fraudulently adulterated copies to Santosusso and the banks for loans.

Case ID: 160302832

93.    Indeed, Santosusso never even communicated with Plaintiff Green, which any reasonable banking officer would do to perform due diligence and to confirm financial and factual details.

94.    Defendant DiDio completed and signed the Bancorp financial statement on February 6, 2013, two weeks after completing the financial statement for Hudson Bank's $1,900,000 loan where he fraudulently misrepresented employment and monthly income of $120,000 from Radnor Trust, even though he was fired from it in 2009 and it had been shut down in 2011.

95.    Defendant DiDio's new statement to Bancorp two weeks later still misrepresents "liquid" assets of $6.5 million, but fraudulently concealed the "wited-out" information, including that access to Plaintiff Green's trust account for her and her children is restricted in terms of annual draws, and is not a qualifying asset anyway because it is in trust.

96.    Defendant DiDio also misrepresented the $7 million in value to real estate, only showing the $1.4 million loan on Monk Road, and fraudulently concealing the $1.0 million loan on Margate.

97.    Bancorp agreed to a $1.1 million loan but required a second mortgage on both the Mirabeau Lane property and the Monk Road property.

98.    Defendant DiDio's mortgage applications for Mirabeau Lane fraudulently inflated assets of $22.5 million on a January 23, 2013 financial statement, which was double the amount he submitted for the Monk Road mortgage a year earlier.

99.    As set forth below, Defendant DiDio placed a third mortgage on the Mirabeau property for $650,000 on June 14, 2014 to further collateralize an equipment loan from WSFS/M&T Bank for Peak Performance, which was a failing business venture Defendant DiDio

Case ID: 160302832

abused to siphon of funds for his own personal use.

100.    Defendant DiDio abused the Mirabeau property, and committed bank and mortgage fraud concerning it, to conceal his theft of millions of dollars from Plaintiff through his other schemes, as set forth above concerning the Margate and Monk Road properties, and as set forth below.

### Radnor Trust

101.    Defendant DiDio fraudulently manipulated business and financial transactions to misappropriate money from Plaintiff's accounts, business accounts and joint accounts into his own personal accounts and his American Express accounts.

102.    From Parke Bank alone, Defendant DiDio disbursed over $3 million dollars to his American Express accounts.

103.    In 2007, an unemployed Defendant DiDio founded a bank, Radnor Trust, which was funded by Plaintiff Green's money. DiDio did not have any funds to invest and therefore did not do so.

104.    Defendant DiDio used $1,000,000 of Plaintiff's money for Plaintiff's 49% co-ownership with Nextier Bank's 49% in Radnor Trust, and positioned himself as CEO.

105.    Additionally, DiDio deposited $2 million of Plaintiff's funds into an account at Radnor Trust.

106.    Nextier Bank was a full service bank located in Western Pennsylvania. Its role was to support Radnor Trust's efforts on a scheduled fee basis with the expectation that Radnor Trust would generate trust and other deposits that would support loan activities and interest margins to in turn support Radnor's overhead, pay fees to Nextier and be profitable to its two primary shareholders, Plaintiff Green and Nextier.

Case ID: 160302832

107.    Defendant DiDio prepared a business plan with projected growth in deposits and loan expectations.    These expectations were not met and losses occurred monthly as net operating income could not cover overhead costs, including DiDio's salary.    There was also an increasing concern by Nextier about loan quality and possible write-offs.

108.    In 2009, Nextier demanded that Defendant DiDio be fired from Radnor Trust, and he was removed for misconduct.

109.    On June 4, 2010, Defendant DiDio withdrew interest of $71,574 accrued on Plaintiff's accounts at Radnor Trust, which also disappeared into his pockets.

110.    In December 2010, Nextier Bank decided it had to close Radnor Trust because it was unprofitable, both loan and deposit volumes kept declining, and significant asset quality problems had been caused by Defendant DiDio before he was terminated that resulted in over $1,000,000 of charge offs and write downs.

111.    By March 2011, Radnor Trust shut its doors, dismissed its employees and ceased operating.

112.    Of Plaintiff's $1 million invested dollars used by Defendant DiDio for Plaintiff's 50% share of Radnor Trust, Plaintiff lost all but approximately $24,000 of it because of Defendant DiDio's misconduct.

**ECAP IV / Peak Performance**

113.    By February 2011, Plaintiff's deposited funds at Radnor Trust totaled $2,025,000, including additional accrued interest.

114.    Defendant DiDio transferred the entire $2,025,000 to his Bank of America account in February, 2011.

115.    Within a month, Defendant DiDio moved the $2,025,000 to eight (8) separate

Case ID: 160302832

accounts in the name of James DiDio, In Trust For Plaintiff's child -- six (6) accounts for $245,000, one (1) for $490,000, and one (1) for $65,000. The monies stayed in the accounts for six (6) months, and were then transferred back to Defendant DiDio's account, including accrued interest of approximately $32,500. Defendant DiDio withdrew $31,500, which disappeared into his pockets.

116.    Of the $2,025,000, Defendant DiDio transferred $1,000 to secretly open an AmEx high yield investment account. As set forth below, three years later, and likely before then, he used the AmEx high yield account to funnel and drain money in the six figures for his own personal piggy bank.

117.    In November 2011, after Nextier had shut down Radnor Trust because of his misconduct and improprieties, Defendant DiDio caused the formation of ECAP IV to fund the operation of another business to pay himself fees and income out of Plaintiff Green's money and assets.

118.    In or around December 2011, Defendant DiDio caused $2,000,000 of Plaintiff's funds to be wire transferred to the Pepper Hamilton estate account as funding to purchase an interest in two fitness facilities in Washington, D.C., Peak Performance t/a Results Gym, which was booked as a loan from Plaintiff.

119.    Defendant DiDio solely performed all due diligence to purchase Peak Performance and the gyms in Washington, D.C., and Plaintiff relied entirely on him to do so.

120.    Peak Performance started in December 2011 with the purchase of two fitness gyms in Washington, DC.

121.    Peak Performance was a wholly owned subsidiary of ECAP IV, and the only asset of ECAP IV.

Case ID: 160302832

122.    The purchase price was approximately $3,600,000 funded by loans from ECAP IV of $890,000 in equity from the partners, including Plaintiff Green, WSFS of $750,000 which was fully collateralized by Plaintiff, and a $2,000,000 loan from Plaintiff Green which was subordinated to the WSFS loan.  DiDio did not contribute any funds because he did not have any.

123.    The $750,000 loan from WSFS was based on a March 22, 2012 financial statement fraudulently submitted by Defendant DiDio that misrepresented net worth to be $27.2 million.

124.    Defendant DiDio named himself CEO, but instead of taking a salary, was paid a management fee.  He had no experience in managing fitness centers.

125.    For the first thirteen (13) months, the business lost $425,000, but covered the deficit in cash through prepaid fees from gym members.

126.    By the end of 2012, it became apparent that one of the two gyms purchased would be a continuing loser and a decision was made to shut one down, thereby recognizing that they would have to write off an additional $460,000 for 2012.

127.    In 2013, revenues were down from $7.3 million in 2012 to $5.2 million and the loss increased to $848,000 in 2013 further jeopardizing Plaintiff Green's investment and more importantly, her $2,000,000 subordinated loan.

128.    By the end of 2013, Peak Performance was struggling to pay its bills and Defendant DiDio's response was to scheme to borrow more money and further put Plaintiff Green's other assets in jeopardy by additional guarantees, including mortgages on Plaintiff's homes and her personal guarantees, to keep the business afloat for him to continue to use to funnel Plaintiff's funds to himself.

Case ID: 160302832

129.    On November 13, 2013, Defendant DiDio fraudulently presented a signed financial statement to WSFS/M&T showing a net worth of $36 million, up $14 million from his statement nine-months earlier on January 23, 2013 to Hudson Bank and up $22 million from his February 6, 2013 financial statement eight months earlier to Bancorp.

130.    Defendant DiDio fraudulently misrepresented the value of the Mirabeau Lane property to be $10 million, which he had purchased six months earlier for $3.8 million, and was in receipt of an independent appraisal assessing it for $3.9 million.

131.    Defendant DiDio also sucked funds out of the Peak Performance business until he ran it into the ground.

132.    Indeed, he sunk another $800,000 of Plaintiff's funds into Peak Performance, bringing the total amount of Plaintiff's funds to be $3.6 million.

133.    Defendant DiDio caused Peak Performance to pay himself a generous salary.

134.    He charged five and six figure business expenses for Peak Performance with his personal American Express cards, was reimbursed by Peak Performance, and then paid off his American Express cards with Plaintiff's funds.

135.    For example, between May and June 2014, as CEO, Defendant DiDio was supposed to purchase approximately $143,000 in equipment for the gym.

136.    Instead, he purchased $71,000 of equipment with one of his American Express card accounts.

137.    Defendant DiDio maintained various accounts at American Express, including the "Black Card," which costs an initial fee of $7,500 to obtain, and then $2,500 in annual fees.

138.    To do so, on information and belief, he misrepresented income of $1.5 million to American Express.

Case ID: 160302832

139.    Defendant DiDio then used Plaintiff's funds, and on information and belief stolen trust funds, to pay his American Express accounts.

140.    Defendant DiDio then paid off the $71,000 on his AmEx for the equipment with Plaintiff's money from Parke Bank, and took a promissory note from Peak Performance / Results Gym for $71,000.

141.    After the M&T Bank loan closed, Defendant DiDio attempted to wire transfer $101,000 from Peak Performance to one of his American Express accounts, and another $35,000 as a "loan" to the business.

142.    After American Express rejected the wire transfer, he simply wrote a check from Peak Performance to himself for $101,000 of Plaintiff's money, and put it into one of his personal Ameritrade Accounts.

143.    In December 2012, Defendant DiDio opened TD Ameritrade accounts, and opened two more in January and May 2014, as well as ETrade accounts, which he abused to divert funds.

144.    Defendant DiDio thereby manipulated and grossly mismanaged Peak Performance to deplete in excess of the $3.6 million from Plaintiff for his own personal use and profit, as well as the loss of the business' viability and profits, and laundered hundreds of thousands of dollars to himself.

145.    On June 14, 2014, Defendant DiDio placed a third mortgage on the Monk and Mirabeau properties for $650,000 to further collateralize an equipment and working capital loan from M&T Bank for Peak Performance.

### **Majestic Jet / PushFly**

146.    In April 2012, although Defendant DiDio was not a licensed pilot and could not

Case ID: 160302832

fly an plane, he custom ordered a Cirrus airplane with Plaintiff Green's money.

147.    In concert with Rick Ianieri and TJ Beverley, who were located in southeastern Florida near Defendant DiDio's accountant son, Defendant Nicholas DiDio, and Arthur Jensen, an accountant in the Washington, D.C. area, Defendant DiDio created an entity called Pushfly, and operated it as Majestic Jet and/or Majestic Jet Global.

148.    Rick Ianieri, of Florida, was convicted of a felony for taking kickbacks and preparing and submitting fraudulent invoices.

149.    TJ Beverley, now of Pompano Beach Florida, was convicted of bank fraud and money laundering in connection with certain businesses he owned and/or controlled in Texas, including Tyler Jet and Executive Aviation, and is forbidden from borrowing money or entering into loan transactions without court approval.

150.    The address for PushFly was at the same address as Peak Performance at Results Gym, 351 G Street, SE, Washington, DC 20003.

151.    On November 5, 2012, the Federal Aviation Administration issued a Certificate of Registration for the Cirrus to PushFly.

152.    The Cirrus was based in a hangar at Wings Field in Blue Bell, Pennsylvania.

153.    However, it was leased to and insured by Majestic Jet, Inc., controlled by Ianieri and Beverley, at 1401 NE 10th Street, Pompano Beach, Florida 22060.

154.    Majestic Jet was owned and/or controlled by Rick Ianieri and TJ Beverley.

155.    Ianieri and Beverley operated Majestic Jet as a private charter services between Florida and Pennsylvania and New Jersey, and in 2013, Majestic Jet began to offer fractional ownership interests in its aircrafts.

156.    In August 2014, Defendant DiDio sold the Cirrus for approximately $600,000.

Case ID: 160302832

As set forth below, instead of the proceeds from the sale going to the owner, PushFly, and being duly and properly disbursed to Plaintiff, Defendant DiDio fraudulently moved the $600,000, as part of other fraudulently diverted funds in excess of $1.1 million dollars belonging to Plaintiff Green, to himself for his own personal piggy bank.

157.    In mid-August 2014, Defendant DiDio travelled to Fort Lauderdale and met with Rick Ianieri and his son, Defendant Nicholas J. DiDio, who is an accountant and was living in Weston, Florida, and in close proximity to Ianieri, Beverley and Majestic Jet.

158.    On October 14, 2014, approximately two weeks after Defendant DiDio vacated the Maribeau Lane property, Executive Air Services, announced the acquisition of Majestic Jet.

159.    Defendant DiDio utilized an email address and owned a domain name @majesticjetglobal.com, and continued to do after he vacated the Maribeau Lane property on September 27, 2014.

160.    On information and belief, Defendant DiDio conspired with Ianieri, Beverley and Arthur Jensen, concerning various schemes involving Majestic Jet, PushFly and/or Peak Performance to divert and steal money, funds, assets and property of Plaintiff Green.

**Dynasty Motors**

161.    In or around 2010 and/or 2011, Defendant DiDio's son Co-Conspirator Luke DiDio had serious drug addictions, and required inpatient detoxification and rehabilitation treatment.  He entered the Fresh Start Program in California, which, upon information and belief, Co-Conspirator DiDio secretly paid for with Plaintiff's funds.

162.    Defendant DiDio requested that Plaintiff Green allow his son Luke to sell certain of Plaintiff's furniture, which was worth in excess of $100,000, and she agreed that he could

Case ID: 160302832

retain a 20% commission on the sold furniture.

163.    Instead, Defendant DiDio secretly rented a storage locker and stored the furniture.

164.    When Plaintiff inquired as the status of the sale of the furniture, Defendant DiDio misrepresented that Co-Conspirator Luke DiDio had sold it in a bulk sale and spent all the money on drugs.

165.    On August 30, 2013, Co-Conspirator Luke DiDio filed Articles of Organization to form Defendant Dynasty Motors in Wilmington, North Carolina.  However, Defendant Dynasty Motors did not have any assets or property, and had limited operations as an internet retailer.

166.    Between December 2013 and April 2014, Defendant DiDio and his sons Michael, Nicholas and Christopher worked on plans to operate a brick and mortar retail car businesses.

167.    During this time, in January 2014, DiDio forged Plaintiff's initials and/or signatures to transfer hundreds of thousands of dollars from Plaintiff's account at WSFS to his own account at ETrade.

168.    In January and February 2014, Defendant James DiDio, Co-Conspirator Michael DiDio and Defendant Nicholas DiDio were working on the business plan for the car dealership, with Defendant James DiDio's participation as a member of the Board of Directors.

169.    In and around February 2014, Defendant DiDio and Michael Santosusso conspired with Defendant DiDio's sons, Luke, Michael, Christopher, Jacob and Nicholas, to obtain financing for a luxury re-sale automobile dealership, which was then used to facilitate and assist in laundering funds, assets and property stolen from Plaintiff.

170.    On April 23, 2014, Co-Conspirator Luke DiDio filed an Annual Report with the State of North Carolina indicating that he was still the sole owner and official of Dynasty Motors.  However, Defendant DiDio and his sons, co-conspirators and/or co-defendants, Luke,

Case ID: 160302832

Michael, Nicholas, Christopher and Jake, were already conspiring to open a showroom and office for a luxury re-sale vehicle dealership with Plaintiff's money, assets and property.

171.    In and around June 2014, even though Plaintiff did not have security access to her own accounts, Defendant DiDio changed all passwords and security information at all of Plaintiff's banking and financial institutions to further ensure she could not access any accounts, including the accounts at Parke Bank and Citizens in Philadelphia.

172.    Between June and August, 2014, Defendant DiDio fraudulently diverted in excess of $1.1 million of Plaintiff Green's money, including proceeds from the sale of the Cirrus and funds from joint accounts in Philadelphia in the names of Marla Green and James DiDio.

173.    Defendant DiDio transferred Plaintiff's misappropriated funds in excess of $1.1 million from Citizens into his TD Ameritrade account, and then transferred the misappropriated funds into his TD Ameritrade money market account, for his own personal piggy bank.

174.    In September 2014, Defendant DiDio changed internet and security access codes for the TD Ameritrade accounts.

175.    In September 2014, Defendant James DiDio and his son Co-Conspirator Michael DiDio continued looking for property to purchase or lease to open a car dealership to launder the money, assets and property stolen from Plaintiff Green.

176.    Defendant James DiDio and his co-conspirator sons, Michael and Luke, found property near the airport in Wilmington, North Carolina to lease to open a car dealership.

177.    Between October 2014 and February 2015, Co-Conspirators Michael and Luke DiDio announced the opening of a showroom and facility for Dynasty Motors at 2201 Blue Clay Road in Wilmington, North Carolina.  2201 Blue Clay Road is also known as 2610 N. 23rd Street.

Case ID: 160302832

178.   Within two (2) months, by April 2015, Co-Conspirator Michael DiDio, who resides in Haddon Heights, and is a realtor in New Jersey, was the Chief Executive Officer, Co-Founder and Co-Owner of Defendant Dynasty Motors in Wilmington, North Carolina.

179.   DiDio family members publicly boasted that all of Defendant James DiDio's sons, Co-Conspirators Michael DiDio and Luke DiDio, and Defendants Nicholas DiDio, Christopher DiDio and Jacob DiDio have ownership interests in Defendant Dynasty Motors, and/or are employees, officers or otherwise participated in the formation and operation of Defendant Dynasty Motors.

180.   Co-Conspirators Michael DiDio and Luke DiDio, and Defendants Christopher DiDio and Jacob DiDio publicly marketed themselves as owners and/or employees of Defendant Dynasty Motors, LLC.

181.   Defendant Dynasty Motors' web page touted that "Luke has started this business with his personal savings which he has acquired from bartending" at Shuckers Oyster Bar & Grill.  However, in 2010 and 2011, Luke had serious drug additions, and required detoxification and rehabilitation treatment.

182.   Defendant Dynasty Motors boasted that it grossed $5.5 million dollars in revenue in its first three years.

183.   Neither Co-Conspirator Michael DiDio nor Co-Conspirator Luke DiDio had sufficient funds, assets or credit to lease and renovate the property at 2610 N. 23rd Street, which was owned by the airport authority.

184.   It was not Luke's savings from bar-tending that started Defendant Dynasty Motors.  It was started by money, assets and property stolen and diverted from Plaintiff Green, and her accounts in Philadelphia at Parke Bank, Citizens Bank and other banks and financial

Case ID: 160302832

institutions, and/or by falsely and fraudulently misrepresenting her assets and/or collateral.

185.    Defendant Dynasty Motors opened with inventory of hundreds of thousands of dollars of vehicles fraudulently obtained and secured by and/or with funds stolen and diverted from Plaintiff Green.

186.    Its building was also furnished with the furniture that Defendant DiDio, and his co-conspirator sons Luke and Michael, stole from Plaintiff Green that Defendant DiDio secretly stored in a storage locker until Defendants could open Dynasty Motors.

*        *        *

187.    As more fully set forth above, Defendant DiDio acted and conspired with and was aided and abetted by Santosusso, and others named and unnamed herein, to commit fraud, bank fraud, mortgage fraud, mail and wire fraud, conversion and theft, in and around Philadelphia, Pennsylvania, and to launder Plaintiff Green's money, including funds held in trust.

188.    As also more fully set forth above, Defendant DiDio acted and conspired with and was aided and abetted by Santosusso, and Co-Conspirators Michael DiDio and Luke DiDio, and Defendants Nicholas DiDio, Christopher DiDio, Jacob DiDio and others named and unnamed herein, in and around Philadelphia, Pennsylvania, New Jersey, Florida, Delaware, Washington, D.C., and North Carolina, to divert, convert and steal Plaintiff Green's money, assets, property and other things of tangible value for their own personal benefit.

189.    As a direct result of Defendants' misconduct, Plaintiff Green has suffered damages in excess of the jurisdictional amount, and is entitled to consequential damages, incidental damages, punitive damages and the other relief set forth herein.

190.    Plaintiff reserves the right to amend this Complaint because discovery will reveal further illegal misconduct by the Defendants and by Defendants John Does 1-10 and Jane Does

30

Case ID: 160302832

1-10, some of whom are identified herein but not yet named as defendants, such as Ianieri, Beverley Jensen, and others, and those who are individuals and businesses located in Pennsylvania, New Jersey, North Carolina, Florida, Maryland and Delaware, and other parts yet unknown, who conspired with and aided and abetted Defendant James DiDio's fraudulent schemes to steal from and systematically drain financial accounts and assets of Plaintiff Green and of the beneficiaries of trusts and trust accounts.

**COUNT I**

**FRAUD – AGAINST ALL DEFENDANTS**

191.    All the foregoing paragraphs are incorporated herein by reference as if fully set forth.

192.    As more particularly set forth above, Defendants intentionally and without justification conspired to and perpetrated a fraud upon Plaintiff, in and around Philadelphia, Pennsylvania, New Jersey, Delaware, Washington, D.C., Florida and North Carolina, to steal from and systematically drain her financial accounts, assets and property, and to drain the financial accounts and assets of the beneficiaries of trusts and trust accounts.

193.    Defendants' acts in carrying out their fraudulent scheme, conspiracy and artifice to defraud Plaintiff create joint and several liability, without limitation, for the damages incurred by Plaintiff as a result of the fraudulent misrepresentations, omissions and actions of Defendants.

194.    As more fully set forth above, Defendants made false, misleading and material misrepresentations and omissions to Plaintiff Green, banks, financial institutions and others, with the knowledge of their falsity and/or with reckless disregard for their truth.

195.    Defendants' acts in furtherance of their fraud and misconduct are further set forth in this Complaint.

Case ID: 160302832

196.   As set forth above, each Defendant knowingly and substantially aided, abetted and benefited from said tortious misconduct.

197.   Had Plaintiff known of such misconduct, she would not have allowed Defendant DiDio access to her money, property, accounts, assets, financial information, passwords, signatures, power of attorney, and other information that he fraudulently manipulated to convert, divert and misappropriate her funds and property.

198.   The acts committed by Defendant DiDio concerning the mortgages on the Margate property, Monk Road property and Mirabeau property; the formation of ECAP; the purchase of and loans to Peak Performance; and the formation of PushFly; and the other loans and financial transactions and ventures set forth above constitute fraud under Pennsylvania law.

199.   The acts committed by Defendant DiDio fraudulently induced Plaintiff to enter into the formation, operation and dissolution of Radnor Trust; the mortgages on the Margate property, Monk Road property and Mirabeau property; the formation of ECAP; the purchase of and loans to Peak Performance; and the formation of PushFly; and the other loans and financial transactions and ventures set forth above that constitute fraud under Pennsylvania law.

200.   The acts committed by Defendants concerning the formation and operation of Dynasty Motors constitute fraud under Pennsylvania law.

201.   Defendant DiDio was aware of the material misrepresentations and omissions he made to Plaintiff Green, banks, financial institutions and others, and he conspired with Santosusso and others to fraudulently induce Plaintiff to enter into the mortgages on the Margate property, Monk Road property, Mirabeau property and the loans for Peak Performance.

202.   Defendant DiDio and the other Defendants were all aware of the material misrepresentations and omissions made by each other and by Defendant DiDio to Plaintiff, and

Case ID: 160302832

they conspired with each other to fraudulently steal, convert and divert Plaintiff's property, assets and funds to fund, open and operate Dynasty Motors and its facility in Wilmington, North Carolina.

203.    Plaintiff reasonably relied upon Defendants' misrepresentations and material omissions.

204.    As a direct and proximate result of Defendants' misconduct, omissions and misrepresentations, Plaintiff has incurred substantial damages in excess of the jurisdictional amount, including but not limited to the damages described above, for which Defendants are jointly and severally liable.

205.    The above described misconduct and misrepresentations are outrageous, willful, intentional, false, malicious, reckless, wanton and in bad faith, and done with the willful disregard for the interests of Plaintiff, for which an award of punitive damages is warranted.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages in excess of the jurisdictional amount, together with costs of this action, pre and post-judgment interest and such other damages for delay as are provided by law, punitive damages, equitable and injunctive relief, an accounting, and such other and further relief in Plaintiff's favor as the Court deems proper.

## COUNT II

## CIVIL CONSPIRACY – AGAINST ALL DEFENDANTS

206.    All the foregoing paragraphs are incorporated herein by reference as if fully set forth.

207.    Defendant DiDio, Co-Conspirators Santosusso, Michael DiDio, Luke DiDio, the other Defendants and others, conspired, combined or agreed with each other to engage in the

Case ID: 160302832

fraudulent, tortious and otherwise illegal misconduct alleged herein, including but not limited to commit fraud; bank fraud; mortgage fraud; mail and wire fraud; conversion and theft; and to launder Plaintiff Green's money; and scheming to defraud Plaintiff; and acting in bad faith.

208.    As more fully set forth above, and in furtherance of this conspiracy, Defendant DiDio, Co-Conspirators Santosusso, Michael DiDio, Luke DiDio, the other Defendants and others  agreed with each other to use the United States mail, the wires and interstate commerce to commit fraud; bank fraud; mortgage fraud; mail and wire fraud; conversion and theft.

209.    In furtherance of this conspiracy, Defendant DiDio, Co-Conspirators Santosusso, Michael DiDio, Luke DiDio, the other Defendants and others agreed with each other to steal, misappropriate, convert, divert and illegally take Plaintiff Green's money, including funds held in trust, property, assets and other things of value to open and operate Dynasty Motors at Clay Road and to illegally launder money.

210.    In furtherance of this conspiracy, Defendant DiDio, Co-Conspirators Santosusso, Michael DiDio, Luke DiDio, the other Defendants and others, agreed with each other to their schemes to steal from and systematically drain financial accounts and assets of Plaintiff Green and of the beneficiaries of trusts and trust accounts.

211.    In furtherance of this conspiracy, Defendant DiDio, Co-Conspirators Santosusso, Michael DiDio, Luke DiDio, the other Defendants and others, agreed with each other to the schemes to defraud Plaintiff as more fully set forth above.

212.    These acts constitute a wrongful combination or agreement to do unlawful acts, or alternatively, a wrongful combination or agreement to do otherwise lawful acts by unlawful means.

213.    Defendant  DiDio's,  Co-Conspirators  Santosusso's,  Michael  DiDio's,  Luke

34

Case ID: 160302832

DiDio's, the other Defendants' and others' conspiracy and concerted overt acts, as more fully described above, were malicious and done without justification or excuse.

214.    Defendant DiDio, Co-Conspirators Santosusso, Michael DiDio, Luke DiDio, the other Defendants and others, were, at all relevant times, fully aware of the misconduct, misrepresentations and omissions complained of herein.

215.    As set forth above, each Defendant and Co-Conspirator knowingly and substantially aided, abetted and benefited from said tortious misconduct.

216.    As a result of Defendants' actions pursuant to said conspiracy, Plaintiff has suffered the damages set forth above for which Defendants are jointly and severally liable.

217.    The above described misconduct is outrageous, willful, intentional, false, malicious, reckless, wanton and in bad faith, and done with the willful disregard for the interests of Plaintiff, for which an award of punitive damages is warranted.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages in excess of the jurisdictional amount, together with costs of this action, pre and post-judgment interest and such other damages for delay as are provided by law, punitive damages, equitable and injunctive relief, an accounting, and such other and further relief in Plaintiff's favor as the Court deems proper.

## COUNT III

## CONVERSION – AGAINST ALL DEFENDANTS

218.    All the foregoing paragraphs are incorporated herein by reference as if fully set forth.

219.    The property, assets, funds and other things of value described herein are the property of Plaintiff, and Plaintiff alone has the right possess them.

Case ID: 160302832

220.    The property, assets, funds and other things of value described herein were stolen from Plaintiff, and Defendants are in possession of them.

221.    Defendants' possession is inconsistent with Plaintiff's rightful possession of her property.

222.    Plaintiff has not given Defendants permission to possess her property, assets, funds and other things of value, and there is no contractual, legal, or equitable justification which permits Defendants to continue to retain Plaintiff's property.

223.    Plaintiff has paramount title and interest in the aforesaid property, assets, funds and other things of value, and Defendants have no valid claim of title or ownership.

224.    Defendants have harmed and continue to harm Plaintiff by converting, stealing and continuing to unlawfully possess Plaintiff's property, which must be returned to Plaintiff and Plaintiff must be made whole by Defendants.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendants and issue equitable relief requiring Defendants to return all of Plaintiff's property, assets, funds and other things of value in their possession, custody or control, award compensatory damages in excess of the jurisdictional amount, together with costs of this action, pre and post-judgment interest and such other damages for delay as are provided by law, punitive damages, equitable and injunctive relief, an accounting, and such other and further relief in Plaintiff's favor as the Court deems proper.

## COUNT IV

## BREACH OF FIDUCIARY DUTY – AGAINST DEFENDANT JAMES DIDIO

225.    All the foregoing paragraphs are incorporated herein by reference as if fully set forth.

Case ID: 160302832

226.   As set forth above in more detail, Defendant DiDio, as Plaintiff's husband, financial advisor and holder of her power of attorney, had a fiduciary duty to Plaintiff Marla Green.

227.   Defendant DiDio used his banking and financial experience to steal millions of dollars from Plaintiff Green.

228.   Defendant DiDio also used his special and fiduciary relationship with her as her husband and financial advisor, to gain access to her accounts, confidential information, passwords, copies of her signature and power of attorney, to steal millions of dollars from Plaintiff Green, including cash, stock, securities, property and other tangible things of value.

229.   Santosusso owed fiduciary duties to Plaintiff Green as a mortgage broker and employee of Vantage Point Bank.

230.   At all relevant times, Defendant DiDio and Santosusso breached their fiduciary duties to Plaintiff Green by conspiring with each other, the other Defendants and others, to falsely misrepresent financial information to her, and to others described above, relating to her assets, monetary accounts, business transactions, investments, mortgage and bank applications, other loan applications and property.

231.   As alleged herein, Defendant DiDio and Santosusso breached their fiduciary duties to Plaintiff Green by making the false and misleading misrepresentations, omissions and misconduct more fully set forth above.

232.   These breaches of fiduciary duty induced Plaintiff Green to enter into the formation, operation and dissolution of Radnor Trust; the mortgages on the Margate property, Monk Road property and Mirabeau property; the purchase of Peak Performance; the formation of PushFly; and the other loans and financial transactions and ventures set forth above, and

Case ID: 160302832

which also constitute breaches of fiduciary duty.

233.   Plaintiff relied upon Defendant DiDio, Santosusso, Vantage Point Bank, Parke Bank, Citizens, WSFS, M&T, and the other banks and financial institutions identified above, to represent, preserve, protect and further her interests, rights, property and claims.

234.   Plaintiff and others, including the beneficiaries of trusts, relied upon Defendant DiDio and Santosusso to represent, preserve, protect and further their interests, rights, property and claims.

235.   Defendant DiDio regularly reported to Plaintiff with regard to the matters entrusted to him pertaining to ensuring the protection of Plaintiff' interests, rights, property and claims.

236.   Plaintiff reasonably believed that Defendant DiDio would act in good faith and in Plaintiff's interests, rights, property and claims.

237.   Defendant DiDio inspired confidence and trust by repeatedly reaffirming that he and Santosusso represented Plaintiff' interests, rights, property and claims.

238.   Plaintiff reasonably believed that Defendant DiDio and Santosusso, Vantage Point Bank, Parke Bank Citizens, WSFS, M&T, and the other banks and financial institutions identified above, would act in good faith and on behalf of her and trust beneficiaries, and their interests, rights, property and claims.

239.   Based upon the relationship between Defendant DiDio and Plaintiff, Defendant DiDio and Parke Bank, and Santosusso, Defendant DiDio and Vantage Point Bank, and their relationships with the other banks and financial institutions identified above, and beneficiaries of the trusts as described herein, Defendant DiDio owed Plaintiff fiduciary duties to act in good faith and in the best interests of Plaintiff over the interests of others.

Case ID: 160302832

240.    However, as set forth above, Defendant DiDio breached his fiduciary duties and his duties of good faith and fair dealing to Plaintiff and to the beneficiaries of trusts.

241.    Plaintiff Green suffered damages as a result of Defendant DiDio's breaches of fiduciary duties.

242.    The above described misconduct and misrepresentations are outrageous, willful, intentional, false, malicious, reckless, wanton and in bad faith, and done with the willful disregard for the interests of Plaintiff, for which an award of punitive damages is warranted.

WHEREFORE, Plaintiff demands judgment against Defendant James DiDio for compensatory damages in excess of the jurisdictional amount, together with costs of this action, pre and post-judgment interest and such other damages for delay as are provided by law, punitive damages, equitable and injunctive relief, an accounting, and such other and further relief in Plaintiff's favor as the Court deems proper.

## COUNT V

### EQUITABLE AND INJUNCTIVE RELIEF – AGAINST ALL DEFENDANTS

243.    All the foregoing paragraphs are incorporated herein by reference as if fully set forth.

244.    As a result of Defendants' fraud, conspiracy, conversion, fraudulent inducement, breaches of fiduciary duties, and other misconduct set forth herein, Plaintiff Green is entitled to equitable and injunctive relief against Defendants, including an accounting, and a freeze on all financial accounts, business accounts, personal accounts, operations accounts, securities, assets, collateral, real and personal property, and other things of value.

WHEREFORE, Plaintiff respectfully demands the following equitable and injunctive relief against all Defendants:

Case ID: 160302832

(a)    the preservation of all of Plaintiff's real and personal property, money, assets, accounts, stocks and bonds and any other things of tangible value;

(b)    the preservation of all records, documents, correspondence, emails and other evidence relating to the allegations and claims set forth herein;

(c)    an accounting;

(d)    a declaration that Defendants committed fraud, conspiracy and conversion for the misconduct more fully set forth above;

(e)    a declaration that Defendant James DiDio breached his fiduciary duties to Plaintiff Marla Green;

(f)    the return of all of Plaintiff's real and personal property, money, assets, accounts, stocks and bonds and any other things of tangible value; and

(g)    any other further relief, in addition to any other relief set forth in this Count, and in favor of Plaintiff, that the Court deems appropriate under the circumstances.


OF COUNSEL:


ELLIOTT GREENLEAF, P.C.

By:    /s/ Timothy T. Myers
       JOHN M. ELLIOTT
       TIMOTHY T. MYERS
       COLIN J. O'BOYLE
       Union Meeting Corporate Center V
       925 Harvest Drive, Suite 300
       P.O. Box 3010
       Blue Bell, PA 19422
DATED:    March 29, 2016        (215) 977-1000


40

Case ID: 160302832

**VERIFICATION**

I, Marla Green, plaintiff in the within matter, state that I am authorized to execute this Verification, and that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

I understand that this Verification is made subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

*Marla Green*

Marla Green

Date: March 29, 2016